## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

NICOLE A. TORRES,
    Plaintiff,

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:10-cv-109

Weber, J.
Litkovitz, M.J.

**REPORT AND**
**RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement of

Errors (Doc. 5) and the Commissioner's response in opposition. (Doc. 10).

### PROCEDURAL BACKGROUND

Plaintiff Nicole A. Torres was born in 1970 and attended school until the 11th grade. (Tr.

87, 149). Her past relevant work was as a receptionist, office clerk, cashier and secretary. (Tr.

27). Plaintiff filed an application for DIB in March 2004, alleging a disability onset date of April

1, 2001, due to a number of symptoms including fatigue, joint pain, muscle weakness, nausea,

stomach cramping, vomiting, diarrhea, insomnia, and depression. (Tr. 87, 121). Her application

was denied initially and upon reconsideration. Plaintiff then requested and was granted a de

novo hearing before an administrative law judge (ALJ), Paul R. Armstrong. The ALJ issued a

decision denying plaintiff's DIB application on April 24, 2007. (Tr. 53-60). On appeal, the

Appeals Council remanded the case for another hearing and further review. (Tr. 82-84). The

Appeals Council determined that the ALJ had made a number of errors in the hearing decision,

which the Court has paraphrased as follows:

1.      The hearing decision did not include an adequate evaluation of the examining source opinion provided by Dr. David Weaver, PhD, a psychologist. Although the decision detailed the results of Dr. Weaver's consultative mental examination, the decision contained no rationale with respect to the weight assigned this evidence. (Tr. 82).

2.      Finding 3 of the hearing decision indicates that the claimant has a mental impairment, but the hearing decision does not include an adequate evaluation of its severity or effects pursuant to 20 C.F.R. § 404.1520a. Nor does the hearing decision include a rationale for "B and C criteria rated in the Psychiatric Review Technique form." (Tr. 82).

3.      Finding 3 of the hearing decision indicates the claimant has severe depression, which the medical evidence indicates may be more severe than was found by the ALJ. The ALJ noted only the lack of treatment by mental health professionals. The decision does not address the limitations specified by consultative examiner Dr. Weaver, which are diagnoses of pain disorder associated with psychological features and general medical condition, bipolar II disorder, and polysubstance abuse in remission. Also, there is a longitudinal history of mental health treatment for anxiety, in addition to depression, by the claimant's family doctors, although the record is not completely clear as to the extent to which the claimant follows the prescribed treatment for her alleged impairments. (Tr. 82).

4.      The hearing decision indicates at pages 6 and 7 that the claimant's fatigue, weakness, joint and back pain, nausea, vomiting and stomach cramps are not credible but does not adequately address whether the claimant has an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the alleged symptoms. If in fact the claimant's subjective complaints were found fully credible, the claimant may not be capable of performing her past relevant work or other work in the national economy. (Tr. 83).

5.      The hearing decision indicates at Finding 5 that the claimant has the residual functional capacity (RFC) to perform a reduced range of sedentary work, but the decision does not contain a function-by-function assessment of the claimant's ability to do work-related physical and mental activities and a sufficient rationale with specific references to evidence in the record in support of the assessed limitations. Additional reasoning is needed to support the conclusions for the RFC. (Tr. 83).

        The Appeals Council directed the ALJ to do the following upon remand:

1.      Endeavor to obtain updated treatment records from the claimant's various treating sources. (Tr. 83).

2.    Obtain additional evidence concerning the claimant's lupus, fibromyalgia and mental impairments in accordance with the regulatory standards regarding consultative examinations and existing medical evidence set forth in 20 C.F.R. §§ 404.1512-1513, including, if warranted and available, consultative examinations for lupus and fibromyalgia, and a mental status examination with psychological testing, an MMPI (Minnesota Multiphasic Personality Inventory), and medical source statements about what the claimant can still do despite her impairments. (Tr. 83).

3.    Give further consideration to the claimant's maximum RFC during the entire period at issue; provide a rationale with specific references to evidence of record in support of assessed limitations in accordance with SSR 96-8p; evaluate the examining source opinion pursuant to the provisions of 20 C.F.R. § 404.1527 and SSR 96-2p and 96-5p; explain the weight given to such opinion evidence; and, as appropriate, request the examining source to provide additional evidence and/or further clarification of the opinion and medical source statement about what the claimant could still do despite the impairments through June 30, 2005, in accordance with 20 C.F.R. § 404.1512. (Tr. 83).

4.    Further evaluate the claimant's subjective complaints and provide a rationale in accordance with 20 C.F.R. § 404.1529, pertinent circuit case law, and SSR 96-7p. (Tr. 83).

5.    Obtain expert medical evidence to clarify the nature and severity of the claimant's lupus, fibromyalgia, and mental impairments and to clarify whether the impairments meet or equal any in the Listings. (Tr. 84).

6.    If warranted by the expanded record, obtain supplemental evidence from a VE to clarify the effect of the assessed limitations on the claimant's occupational base. (Tr. 84).

A second hearing was held before ALJ Armstrong on June 18, 2008. (Tr. 584-618).

Plaintiff, who was represented by counsel, appeared via video conference. The ALJ determined that plaintiff last met the insured status requirements of the Social Security Act on June 30, 2005, and that she had not engaged in substantial gainful activity between her alleged onset date of April 1, 2001, through the date last insured. The ALJ determined that plaintiff suffers from the severe impairments of lupus, fibromyalgia, irritable bowel syndrome, depression and anxiety, but such impairments do not meet or equal the level of severity described in the Listing of Impairments. (Tr. 19-20). According to the ALJ, plaintiff retains the RFC to perform sedentary

3

work with limitations. (Tr. 22). The ALJ determined that plaintiff retains the physical RFC to lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; to stand/and or walk for 2 hours in an 8-hour workday; to sit for 6 hours in an 8-hour workday; to occasionally push and/or pull with her right hand and frequently push and/or pull with her left hand; to reach, finger, and feel frequently with both hands and handle occasionally with her right hand; and to occasionally operate foot controls with her right foot and frequently operate foot controls with her left foot. (Tr. 22). The ALJ found that plaintiff cannot crouch, crawl or kneel; she must avoid hazardous workplaces, including work at unprotected heights or around dangerous moving machinery, open flames or bodies of water; she can have no exposure to heavy vibration or use of power tools; and she cannot work in extreme cold. (Tr. 22, 27). The ALJ found that in view of her mental limitations, plaintiff is limited to performing "simple, unskilled work." (Tr. 22, 27). The ALJ determined that plaintiff's subjective allegations concerning her symptoms are not credible to the extent they are inconsistent with the RFC assessment. (Tr. 23, 26). The ALJ further determined that plaintiff is unable to perform her past relevant work. (Tr. 27). However, using the medical vocational guidelines set forth in Grid Rule 201.25 as a framework for decision-making, and relying on the testimony of an independent vocational expert (VE), the ALJ determined that plaintiff is able to perform a significant number of other jobs in the national economy. (Tr. 28-29). Accordingly, the ALJ concluded that plaintiff was not under a disability within the meaning of the Act from April 1, 2001, through the date last insured. (Tr. 29).

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

4

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g). The Court's sole function is to determine whether the record as a whole contains

substantial evidence to support the Commissioner's decision. The Commissioner's findings

stand if they are supported by "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing

*Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the

Commissioner's findings are supported by substantial evidence, the Court must consider the

record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).

To qualify for DIB, plaintiff must meet certain insured status requirements, be under age

65, file an application for such benefits, and be under a disability as defined by the Act. 42

U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First,

plaintiff must suffer from a medically determinable physical or mental impairment that can be

expected to result in death or that has lasted or can be expected to last for a continuous period of

not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairment must render

plaintiff unable to engage in the work she previously performed or in any other substantial

gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process

for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines

whether the individual is currently engaging in substantial gainful activity; if so, a finding of

nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in

substantial gainful activity, the Commissioner must determine whether the individual has a

severe impairment or combination of impairments; if not, then a finding of nondisability is made

and the inquiry ends.  Third, if the individual has a severe impairment, the Commissioner must

compare it to those in the Listing, 20 C.F.R. Part 404, Subpart P, Appendix 1.  Plaintiff's

impairment need not precisely meet the criteria of the Listing in order to obtain benefits.  It is

sufficient if the impairment is medically equivalent to one in the Listing.  20 C.F.R.

§ 404.1520(d).  To determine medical equivalence, the Commissioner compares the symptoms,

signs, and laboratory findings concerning the alleged impairment with the medical criteria of the

listed impairment.  20 C.F.R. § 404.1526(a).  The decision is based solely on the medical

evidence, which must be supported by medically acceptable clinical and laboratory diagnostic

techniques.  20 C.F.R. § 404.1526(b).  If the impairment meets or equals any within the Listing,

disability is presumed and benefits are awarded.  20 C.F.R. § 404.1520(d).  Fourth, if the

individual's impairments do not meet or equal any in the Listing, the Commissioner must

determine whether the impairments prevent the performance of the individual's regular previous

employment.  If the individual is unable to perform the relevant past work, then a prima facie

case of disability is established and the burden of going forward with the evidence shifts to the

Commissioner to show that there is work in the national economy which the individual can

perform.  *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1053 (6th Cir. 1983); *Kirk v. Secretary
of H.H.S.*, 667 F.2d 524, 529 (6th Cir. 1981).

Plaintiff has the burden of establishing disability by a preponderance of the evidence.

*Born v. Secretary of H.H.S.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d

1181 (6th Cir. 1971).  To rebut a prima facie case, the Commissioner must come forward with

6

particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984). Alternatively, in certain instances the Commissioner is entitled to rely on the grid to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2. *Cole v. Secretary of H.H.S.*, 820 F.2d 768, 771 (6th Cir. 1987).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion of a non-examining medical advisor. *Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir. 1987). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2); *see also Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has

7

only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion. 20 C.F.R. § 404.1527(d). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(d)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(3)-(6); *Wilson*, 378 F.3d at 544. The ALJ must likewise apply the factors set forth in § 404.1527(d)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. § 404.1527(d). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

The opinion of a non-treating but examining source is entitled to less weight than the opinion of a treating source, but is generally entitled to more weight than the opinion of a source

8

who has not examined the claimant. *Ealy v. Commissioner of Soc. Sec.*, 594 F.3d 504, 514 (6th

Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(1); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875

(6th Cir. 2007)). The weight to be afforded the opinion of a non-examining source depends on

the degree to which the source provides supporting explanations for his opinions and the degree

to which his opinion considers all of the pertinent evidence in the record, including the opinions

of treating and other examining sources. 20 C.F.R. § 404.1527(d)(3).

Sixth Circuit case law recognizes that fibromyalgia is a unique type of medical condition

in the sense that it cannot be confirmed by objective testing. *Rogers v. Commissioner of Soc.*

*Sec.*, 486 F.3d 234, 243 (6th Cir. 2007) (citing *Preston v. Sec'y of Health & Human Servs.*, 854

F.2d 815, 820 (6th Cir. 1988)). This Circuit has described fibromyalgia (formerly known as

"fibrositis") and the method of diagnosing the disease as follows:

> [Fibromyalgia] causes severe musculoskeletal pain which is accompanied by
> stiffness and fatigue due to sleep disturbances. In stark contrast to the unremitting
> pain of which [fibromyalgia] patients complain, physical examinations will
> usually yield normal results-a full range of motion, no joint swelling, as well as
> normal muscle strength and neurological reactions. There are no objective tests
> which can conclusively confirm the disease; rather it is a process of diagnosis by
> exclusion and testing of certain 'focal tender points' on the body for acute
> tenderness which is characteristic in [fibromyalgia] patients.

*Preston*, 854 F.2d at 817-818. Because fibromyalgia patients manifest normal muscle strength,

methods and gages such as standard clinical tests, neurological reactions, and full range of

motion are "not highly relevant in diagnosing [fibromyalgia] or its severity." *Id.* at 820. Instead,

the process of diagnosing fibromyalgia includes the testing of a series of focal points for

tenderness and the ruling out of other possible conditions through objective medical and clinical

trials. *Rogers,* 486 F.3d at 244. Moreover, "in light of the unique evidentiary difficulties

associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon

objective evidence are not particularly relevant." *Id.* at 245 (citing *Preston*, 854 F.2d at 820).

## MEDICAL EVIDENCE

Plaintiff was treated on a regular basis at the Pickerington Family Practice from October 2002 to May 2004. (Tr. 181-182, 187-190, 195-218). In October 2002, she was diagnosed with depression and prescribed Paxil. (Tr. 211). She was also prescribed Plaquenil, a lupus[1] medication. Plaintiff was treated at the Pickerington office several times over the next year. (Tr. 195-210). She complained of fatigue in February 2003, and the Paxil was increased. (Tr. 206). Her additional medications during this time period included Phenergan, Lexapro, and Celebrex. In March and May of 2004, her complaints included severe fatigue, paresthesias of the hands and feet, and anxiety. (Tr. 181-182, 187-188). She was prescribed Ambien, Vioxx, Bextra, Fidlen and Nexium in addition to her other medications.

Plaintiff was treated by Dr. Jennifer Richardson, M.D., a rheumatologist, from 2001 to July 2006.[2] (Tr. 157-168; 252-266; 334-358; 370-371, 376-403). On November 20, 2003, plaintiff's chief complaint was lupus. (Tr. 166). Plaintiff was having some joint pain and digestive problems. Her fibromyalgia was somewhat more flared as she had not been getting sleep. Dr. Richardson prescribed Vioxx and Nortriptyline, an antidepressant, and continued plaintiff's Plaquenil prescription. On January 19, 2004, plaintiff was potentially suffering a lupus flare. (Tr. 164). Fatigue during the day was the "biggest problem," possibly secondary to fibromyalgia or lupus. (Tr. 164). In addition to fatigue, plaintiff had recurrent mouth and head

---

[1]"Lupus is a chronic, remitting, relapsing disorder of the connective tissues." *Bowman v. Barnhart*, 310 F.3d 1080, 1084 (8th Cir. 2002). "It is an inflammatory condition that causes pain and swelling that can continually flare-up, subside, and then flare-up again." *Id.*

[2]The earliest office notes by Dr. Richardson in the case file are from 2003.

sores, all of which were consistent with the lupus disease process and diagnosis. Plaintiff had started taking Pamelor, an antidepressant. Plaintiff also had bladder retention and oral ulcers. Dr. Richardson prescribed a tapered course of prednisone, with a prolonged low dose of steroids to be considered if plaintiff showed improvement, and medication for oral ulcers. Dr. Richardson gave plaintiff an anti-inflammatory to try in place of Vioxx and discussed treatment options for plaintiff's fatigue.

On April 2, 2004, plaintiff had acute back pain. (Tr. 162). Her medications included Flexeril, Plaquenil and Vioxx. The muscle relaxant Skelaxin was added to her medications. The lupus seemed to be under control but plaintiff had been having a "significant amount of trouble getting along in her activities of daily living . . ." (Tr. 162).

On April 22, 2004, plaintiff had more pain in her hands and down her legs. Physical examination revealed "periarticular tenderness diffusely through the joints of her body." (Tr. 256). The impressions were lupus, fibromyalgia, and depression. (Tr. 256). The medications Plaquenil, Ultram and Ambien were to be continued. Laboratory testing performed on April 23, 2004, yielded a positive ANA screen, a positive rheumatoid factor, and a speckled ANA screen.[3] (Tr. 262-263).

In June 2004, plaintiff had been "doing very poorly," was not sleeping well, had pain all over, and felt depressed. (Tr. 253). Dr. Richardson adjusted plaintiff's medications, which included Bextra, Ultram for headaches, Ambien for sleep, Pamelor and Skelaxin. In October 2004, plaintiff complained of pain all over, cramping in her hands and legs occasionally, and a

---

[3]"ANA" means antinuclear antibodies. An ANA test is used to detect autoimmune diseases. The ANA result must be interpreted in the specific context of an individual patient's symptoms and other test results. A speckled pattern is seen in many conditions and in individuals who do not necessarily have any autoimmune disease. http://medicinenet.com/antinuclear_antibody/article.htm (last accessed on February 4, 2010).

lot of fatigue in the evening. (Tr. 344). In January 2005, plaintiff had continued fatigue. (Tr. 343). Dr. Richardson adjusted plaintiff's medications. The office notes for July 7, 2005, reflect that plaintiff had been doing well and had then experienced a few bad weeks. (Tr. 341). On August 31, 2005, plaintiff had experienced a worsening of fatigue and pain over the past two weeks as well as sores in her mouth and sore spots on her head. (Tr. 340). Fibromyalgia points were positive on exam. (Tr. 340).

On December 29, 2005, plaintiff reported she had been doing well lately. (Tr. 339). She felt worse over the next few months and on March 10, 2006, complained of numbness in her toes and burning pain down her hands. (Tr. 338). Plaintiff was diagnosed with possible neuropathy in addition to lupus and fibromyalgia. (Tr. 337).

On May 3, 2006, plaintiff's fibromyalgia points were "all significantly tender." (Tr. 336). She had back pain but was improved overall.

Brian M. Isler, M.D., a gastroenterologist, examined plaintiff in December 2003 and January 2004. (Tr. 173-175, 192). In December 2003, he reported that plaintiff had suffered from lupus for two years and also had a back injury and depression. (Tr. 192). His assessment was "lupus with worsening nausea, vomiting, diarrhea and abdominal pain." (Tr. 192). He opined that plaintiff's stomach problems could be complicated by lupus. (Tr. 192).

Dr. Kevin V. Hackshaw, M.D., a rheumatologist, examined plaintiff in January and September of 2007. (Tr. 412-414, 463). In January, the review of plaintiff's systems was positive for fatigue, low-grade fever, sensitivity to cold, congestion, mouth sores, pain with chewing, dryness of the mouth, throat itching, heartburn, nausea, vomiting, diarrhea, chronic headaches, numbness and weakness. (Tr. 412-413). Plaintiff displayed "tender points in 18/18

12

tender point sites, consistent with a diagnosis of fibromyalgia, nothing beyond that." (Tr. 413).

Dr. Hackshaw noted that plaintiff "is limited a lot in terms of running or lifting heavy objects.

She is limited a little in terms of pushing a vacuum cleaner, carrying or lifting groceries, climbing

stairs, bending, kneeling or stooping, riding, getting out of a chair or car, walking a block or

walking a mile." (Tr. 413). Plaintiff's complaints included joint problems which would last

three days at a time and then resolve and stiffness primarily in the neck, back and hips. Plaintiff

complained that nothing completely relieved her pain, although neuromuscular massage was very

helpful, and that a lack of sleep and sitting or standing for too long or "overdoing it" increased

her pain. (Tr. 413). Dr. Hackshaw's general impression was that plaintiff presented with signs

and symptoms consistent with fibromyalgia. Dr. Hackshaw prescribed medication for plaintiff's

pain. In response to her inquiry as to whether she should seek disability, Dr. Hackshaw stated:

> She has a pending disability case. She had spoke[n] with Dr. Richardson who has
> suggested to her that she should be able to work with FMLA. The patient home
> schools her children and states that she is missing so much work where her work
> availability is very unreliable due to frequency of missing days. What I explained
> to her is that the purpose of FMLA is to allow her to have a job, even if she is
> missing days. So, my general impression, based on my first evaluation of the
> patient, is that if she is looking for part-time work and FMLA is allowed, then she
> should be able to at least hold some part-time position.

(Tr. 413-414).

In September 2007, Dr. Hackshaw reevaluated plaintiff's fibromyalgia. (Tr. 463). He

stated that she had tried a few unsuccessful interventions since he had last seen her and had

discontinued certain medications because they made her feel fatigued. He noted this was a

problem since the fatigue interfered with her daily activities, including home schooling her

children. *Id*. Dr. Hackshaw's examination revealed 18/18 tender points, consistent with

fibromyalgia. *Id*.

13

Plaintiff was seen at the National Road Family Health Clinic beginning in November 2007. (Tr. 465-474). In January 2008, Dr. Mary Grulkowski, M.D., a family practice physician, certified that plaintiff had originally been diagnosed with fibromyalgia in April 2002, she is treated approximately 6 times a year for her fibromyalgia, and she is incapacitated from her daily activities for approximately two to three days twice a month due to her condition. (Tr. 465).

Dr. Herbert A. Grodner, M.D., a consulting physician, examined plaintiff on January 31, 2008. (Tr. 433-436). He noted that plaintiff had been off Plaquenil for six months but was taking Lyrica, Lodeine, prenatal vitamins, Flexeril and Darvocet, as well as using Lidoderm patches on an as needed basis. (Tr. 433). On physical examination, Dr. Grodner found that plaintiff had a slightly antalgic gait, and some difficulty with toe and heel walking. She could partially squat but with complaints of back and foot pain. (Tr. 434). Grip strength was 10 psi in the right and 15 psi in the left hand and she complained of right hand pain. (Tr. 435). There was some tenderness over the plantar portion of the right foot, tenderness in the lumbar area, and tender points to digital palpitation. Dr. Grodner summarized his findings as follows:

> In clinical summary, we have a 38-year-old female with a diagnosis of systemic lupus apparently made with serological studies. She does have some musculoskeletal complaints with swelling and joint pain. She also has fibromyalgia and irritable bowel syndrome associated with insomnia and chronic fatigue. She also has depression treated by her family doctor.
>
> Based upon the objective findings, it is my opinion that this lady would have problems with activities that would require primarily repetitive weight bearing such as prolonged standing, walking, climbing, kneeling, lifting more than ten to twenty pounds at any one time. She also might have some problems with repetitive activity in a sedentary position, but she does have problems when she is in a seated position with pain and spasm in her upper and lower back. However, I do feel that she could perform some type of sedentary activity or even light intermittent activity. Those particular restrictions will be noted on the functional capacity form. She could perform activities that require weight bearing and ambulation for relatively short periods of time. In a sedentary position, she would

14

> need to be in as ergonomically optimal position as possible. Because of her pain
> which requires significant pain medication and her history of intermittent muscle
> spasms, it is my opinion that she would have major restriction with activity over a
> period of time. I do believe that she could perform short intervals of a variety of
> activities, but these would depend on how sustained these activities were and also
> how repetitive they were as well as the time frame [during] which she was
> performing these activities. There also is the issue of depression which may play
> a significant role in her overall presentation. Therefore, that particular diagnosis
> needs to be evaluated by the appropriate specialist to assess its impact upon her
> ability to perform daily activities.

(Tr. 436). On the functional capacity form, Dr. Grodner stated that plaintiff could sit and stand

30 minutes without interruption; she could walk 20 minutes without interruption; she could sit

and stand 4 hours in an 8-hour work day; and she could walk 2 hours in an 8-hour work day. (Tr.

442). He identified the medical or clinical findings underlying these limitations as fibromyalgia

with tender points, pain, intermittent joint swelling, and irritable bowel syndrome. (Tr. 442). Dr.

Grodner opined that plaintiff could only occasionally perform handling and pushing/pulling with

her right hand due to pain and swelling and intermittent spasm; she could only occasionally

operate foot controls with her right foot due to pain and swelling of the right foot and some

tenderness on palpation; and she could never climb ladders or scaffolds and could only

occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl due to generalized

joint pain and intermittent spasm. (Tr. 443-444).

Dr. David H. Weaver, Ph.D., a consulting psychologist, evaluated plaintiff on May 24,

2004, prior to the issuance of the ALJ's first decision in this case. (Tr. 227-231). He assessed

plaintiff based on the MMPI-2. (Tr. 229). Dr. Weaver diagnosed plaintiff with pain disorder

associated with psychological features and general medical condition, bipolar II, and

polysubstance dependence in remission. (Tr. 230). Dr. Weaver concluded that plaintiff was

impaired in the following respects:

15

- Her ability to relate to others "is moderately to markedly impaired. The MMPI shows great introversion, anxiety, and trauma signs."
- Her ability to understand, remember and understand instructions is not impaired.
- Her ability to maintain attention, pace and persistence is "moderately impaired due to fatigue, napping and hopelessness."
- Her ability to withstand the stress and pressure of day-to-day work is "moderately to markedly impaired due to her moods and childhood."

(Tr. 231). Dr. Weaver further opined that "The MMPI documents severe emotional symptoms."

(Tr. 231).

Dr. Margaret Smith, Ph.D., a consulting psychologist, evaluated plaintiff on February 20,

2008. (Tr. 447- 455). Dr. Smith opined that plaintiff would be able to relate sufficiently to

others and to coworkers and supervisors for simple and repetitive work tasks which do not

require complicated or detailed verbal instructions; she was mentally capable of understanding,

remembering and following instructions for simple and some multi-step repetitive tasks, but her

mental ability to understand and follow instructions may be moderately impaired by her anxiety

and depression; her mental ability to maintain attention, concentration, persistence and pace to

perform routine tasks may be moderately to markedly impaired, she may have problems with

pace and persistence over prolonged periods of time, including an 8-hour day or 5-day

workweek, and she would do best in work settings that do not require her to work in large groups

or to drive; and her mental ability to withstand the stress and pressures associated with day-to-

day work activity may be moderately to markedly impaired. (Tr. 452). Dr. Smith concluded that

overall, plaintiff has "the mental stress tolerance to perform at least simple and repetitive tasks,

which do not involve [sic] her to work in large groups or to drive." (Tr. 452).

### THE ALJ'S DECISION

The ALJ determined that plaintiff can perform a limited range of sedentary work on a

full-time basis. In making this decision, the ALJ found that plaintiff's medically determinable

impairments could reasonably be expected to produce the alleged symptoms, but that her

statements concerning the intensity, persistence and limiting effects of her symptoms were not

credible to the extent they were inconsistent with the RFC assessment. (Tr. 24). First, in terms

of plaintiff's alleged symptoms, the ALJ found that the objective medical evidence failed to

provide support for her allegations that she is unable to work. The ALJ stated that he considered

the following additional evidence which had been obtained in accordance with the Appeals

Council order:

- An evaluation by plaintiff's "treating rheumatologist" Dr. Hackshaw completed on September 8, 2007
- Updated records of treatment from National Road Family Health for November 6, 2007 through January 17, 2008
- Dr. Grodner's January 31, 2008 examination
- Dr. Smith's February 20, 2008 mental status evaluation

(Tr. 24-25). The ALJ stated that he gave further consideration to plaintiff's RFC "during the

entire period at issue in light of the entire medical evidence of record," including the newly

submitted evidence. (Tr. 25). He found that this objective medical evidence failed to provide

support for plaintiff's allegations that she is unable to work. Specifically, the ALJ determined as

follows:

> [T]he record indicates that her lupus symptoms in particular have been relatively stable to the point where she has discontinued taking medication on occasion. Additionally, the medical evidence of record does not document a longitudinal record of frequent episodes related to her fibromyalgia symptoms. This is consistent with the claimant's testimony which indicates that she experiences only periodic exacerbations of her symptoms. Viewed as a whole, the record does not indicate that her condition deteriorated so significantly to warrant a finding that she was completely unable to work. Indeed, the record indicates that her conditions improved with medication.

(Tr. 25).

Second, the ALJ stated that he considered plaintiff's ability to perform daily activities and

social functions in reaching the RFC assessment. The ALJ stated as follows:

> Although the claimant has reported that she receives assistance from her husband, she is able to carry out a wide range of activities of daily living. The claimant is able to care for her personal hygiene. She can also care for and home school her children. Moreover, the claimant is able to perform household chores, such as cooking and doing laundry. The claimant is also able to go grocery shopping and drive.

(Tr. 26). The ALJ concluded his credibility assessment as follows:

> Following the Appeals Council order, the undersigned gave further consideration to the claimant's subjective complaints. Although the undersigned accepts her allegations that her symptoms limit her functional capacity to a certain degree, the claimant is not credible to the extent that she claims her capacity is so limited that she is unable to engage in substantial gainful activity consistent with the residual functional capacity delineated above. The residual functional capacity above describing a limited range of sedentary work appropriately accounts for the pain the claimant experiences, periodic exacerbations of her fibromyalgia symptoms, the side effects of her medication, and the symptoms she experiences due to depression consistent with the medical evidence of record.

(Tr. 26).

The ALJ then turned to consideration of the opinions of the medical sources. The ALJ

accorded "substantial weight" to the opinion of Dr. Ashok Jilhewar, the non-examining internist

who testified as a medical advisor at the hearing. (Tr. 26). The ALJ stated that Dr. Jilhewar "had

the opportunity to review the entire record and to hear the claimant's testimony and his opinion is

consistent with the totality of the medical evidence of record." (Tr. 26). The ALJ gave "some

weight" to the opinions of the examining medical sources, Dr. Grodner and Dr. Smith, but the

ALJ did not explain how he determined what weight to give their opinions. (Tr. 26). The ALJ

accorded "less weight" to the opinions of plaintiff's treating rheumatologists, Dr. Hackshaw and

Dr. Richardson, that plaintiff would be able to hold "at least a part-time position."[4] The ALJ

discounted these opinions because he found the rheumatologists did not opine "what functions

the claimant would or would not be able to perform that provide the underlying basis for their

opinions." (Tr. 27).[5] The ALJ found:

> In sum, the above [RFC] assessment is supported by the objective medical
> evidence of record and the hearing testimony. The claimant has impairments
> resulting from fibromyalgia, lupus, and depression. At the hearing, the claimant
> alleged that her impairments were severe and precluded her from competitive
> employment. While the claimants's subjective allegations are not entirely
> supported by the totality of the medical evidence, a review of the entire record
> supports a finding of some limitations on the claimant's ability to perform the
> physical and mental demands of work-related activity. Based upon the entire
> record, the claimant retained the [RFC] to perform a limited range of sedentary
> work through the date last insured. . . .

(Tr. 27).

## ASSIGNMENTS OF ERROR

Plaintiff assigns five errors in this case: (1) The ALJ erred by failing to give the most

weight to the opinion of the non-examining medical advisor as compared to the opinions of the

examining and treating physicians; (2) the ALJ erred in evaluating plaintiff's fibromyalgia when

he failed to note that the condition does not produce objective medical findings on exams; (3) the

ALJ violated 20 C.F.R. § 404.1529 and SSR 96-7p in evaluating plaintiff's credibility; (4) the

---

[4]The ALJ elaborated on these opinions by stating that in his January 10, 2007 letter, Dr. Hackshaw noted that plaintiff had reported that Dr. Richardson suggested to her that she would be able to work with FMLA coverage. The ALJ stated that Dr. Hackshaw in turn stated his general impression was that if plaintiff was "looking for part-time work and FMLA is allowed, then she should be able to at least hold some part-time position." (Tr. 27).

[5]The Commissioner argues that the ALJ accurately pointed out at page 27 of the transcript that neither Dr. Richardson nor Dr. Hackshaw limited plaintiff to part-time work, but instead agreed that she would be able to perform part-time work in light of the fact that she was responsible for home-schooling her children. (Doc. 10 at 11). This is not an accurate representation of the record. While Dr. Hackshaw referenced the fact that plaintiff home schools her children, he did not state that plaintiff needed to limit her work schedule to part-time in order to accommodate that undertaking. (Tr. 413-414). Nor did the ALJ interpret Dr. Hackshaw's statement in this manner. (Tr. 27). The Commissioner does not point out where Dr. Richardson allegedly agreed that plaintiff would be able to perform part-time work in light of the fact that she was responsible for home-schooling her children.

ALJ erred in evaluating plaintiff's mental impairments; and (5) the ALJ erred at step 5 of the sequential evaluation process by relying on the VE's answers to improper hypothetical questions. For the reasons that follow, the Court finds that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded for an award of benefits.

## OPINION

**(1) The ALJ erred by giving the most weight to the opinion of the non-examining medical advisor as compared to the opinions of the examining and treating physicians.**

**(2) The ALJ erred in evaluating plaintiff's fibromyalgia when he failed to note that the condition does not produce objective medical findings on exams.**

The Court will consider plaintiff's first and second assignments of error together as they are closely related. Plaintiff argues that the ALJ erred by giving the most weight to the opinion of the nonexamining medical advisor, Dr. Jilhewar, rather than to the opinions of the treating and examining physicians. Plaintiff further claims that the ALJ erred when he failed to note that fibromyalgia does not produce objective medical findings on examination.

The Commissioner counters that a diagnosis of fibromyalgia does not equate to a finding of disability, and the evidence of record in this case does not show that plaintiff's fibromyalgia is disabling. Instead, the Commissioner contends that the ALJ properly determined that the objective medical evidence demonstrates that plaintiff's lupus symptoms were well-controlled and she had only periodic exacerbation of her fibromyalgia symptoms such that she retained the ability to perform a range of sedentary work. The Commissioner argues that in rendering his determination, the ALJ was entitled to discount the opinions of the treating rheumatologists, Dr.

20

Hackshaw and Dr. Richardson, neither of whom restricted plaintiff to part-time work.[6]

In view of the nature of plaintiff's impairments, the fundamental issue in this case is whether there is substantial evidence to support the ALJ's finding that plaintiff has the RFC to perform full-time work, which is contrary to the opinions of the treating and examining physicians in this case.

In accordance with SSR 96-8p, RFC is measured by an "individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," which means "8 hours a day, for 5 days a week, or an equivalent work schedule." This District Court, as well as several other federal appellate and district courts, have observed that "the Commissioner takes the position that at step five of the sequential disability determination, only a claimant's ability to perform full-time work will permit an ALJ to render a decision of 'not disabled.'" *Lawson v. Astrue,* 695 F. Supp.2d 729, 748 (S.D. Ohio 2010) (citing *Barsotti v. Commissioner, Social Sec. Admin.,* No. 99-1089-JO, 2000 WL 328024 (D. Or. March 13, 2000); *Bladow v. Apfel,* 205 F.3d 356, 359 (8th Cir. 2000); *Kelley v. Apfel,* 185 F.3d 1211, 1214 (11th Cir. 1999); *Sims v. Apfel,* 172 F.3d 879 (10th Cir. 1999) (TABLE), 1999 WL 55334, at *3; *Matz v. Sisters of Providence in Oregon,* No. Civ. 98-1598-JO, 1999 WL 1201682 (D. Or. Dec. 8, 1999)). Stated otherwise, "[a] claimant is disabled if he cannot perform full-time work. SSR 96-8p." *Id.* (quoting *Criner v. Barnhart,* 208 F. Supp.2d 937, 956 n.21 (N.D. Ill. 2002); *Gotz v. Barnhart,* 207 F. Supp.2d 886, 897 (E.D. Wis. 2002)). "[P]art-time work does not constitute working on a 'regular and continuing' basis." *Id.* (quoting *Carr v. Apfel,* No.

---

[6]Contrary to the Commissioner's representation (Doc. 10 at 10, n.5), the ALJ found Dr. Hackshaw to be a treating physician, not simply an examining physician. (Tr. 27). The Court will not disturb the ALJ's finding. *Cf. Ealy,* 594 F.3d at 514.

3:97cv7515, 1999 WL 1489892, at \*5 (N.D. Ohio Sept. 29, 1999)). The medical opinions in this case do not provide substantial support for the ALJ's finding that plaintiff is able to perform a limited range of sedentary work on a full-time basis, and the ALJ erred in rendering that RFC assessment for the reasons stated below.

The medical records in this case reveal a patient with the chronic diseases of lupus and fibromyalgia characterized by an array of symptoms which flare and subside, including severe fatigue, joint pain and swelling, and digestive problems. The opinions of the treating physicians consistently reflect that plaintiff's ability to sustain full-time work is restricted because of her impairments.

Dr. Hackshaw, plaintiff's treating rheumatologist, opined in January 2007 that if plaintiff was looking for part-time work and FMLA leave was allowed, plaintiff "should be able to at least hold some part-time position," but he gave no indication plaintiff had the physical capacity for full-time work activity. (Tr. 414). Dr. Hackshaw specifically noted the following symptoms and limitations which supported his opinion:

> She is limited a lot in terms of running or lifting heavy objects. She is limited a little in terms of pushing a vacuum cleaner, carrying or lifting groceries, climbing stairs, bending, kneeling or stooping, riding, getting out of a chair or car, walking a block or walking a mile. She notes pain in the right upper portion of her body above the waist and left lower below the waist primarily. She describes nausea, vomiting, some gas pains that occur on a daily basis . . . She describes joint problems which will last three days at a time and then resolve, stiffness primarily in the neck, back and hips, and she describes a feeling of "knots." She goes to a neuromuscular massage therapist in Marion who has been very successful with her in terms of deep tissue massage . . . Nothing completely relieves her pain, but massage is very helpful. A lack of sleep, sitting or standing for too long or overdoing it will increase her pain. She has some swelling, primarily in her wrists, knees, and ankles with morning stiffness . . . .

(Tr. 413). Dr. Hacksaw's examination revealed 18 out of 18 tender points, "consistent with the

22

diagnosis of fibromyalgia." (Tr. 413). In a follow-up examination in September 2007, Dr. Hackshaw again noted severe problems of pain and fatigue which interfered with plaintiff's ability to perform her regular activities of daily living. (Tr. 463).

Dr. Richardson, another treating rheumatologist, related that plaintiff may be able to work with a qualification: if she was given *FMLA leave*.[7] (Tr. 27, 413). In fact, Dr. Richardson's office notes document that she gave medical authorization for plaintiff's husband to be off work on several dates due to plaintiff's illness (Tr. 335, 339, 340, 342), and the record shows that plaintiff's husband took one or more days of FMLA leave per month during 2005 and 2006 to assist plaintiff at home when she was incapacitated. (Tr. 377-379).

Dr. Grulkowski, plaintiff's treating family physician, also supports the limitation on plaintiff's ability to perform full-time work activity. Dr. Grulkowski opined that plaintiff was incapacitated approximately two to three days, two times each month, from her daily activities due to her chronic condition. (Tr. 465).

The record is replete with medical evidence which supports the treating physicians' opinions that plaintiff's ability to perform work activity on a sustained basis is limited. This evidence includes several years of office notes by Dr. Richardson and from the Pickerington Family Practice. (Tr. 157-166, 181-182, 187-190, 195-218, 248-269, 334-358, 376-403). In these notes, plaintiff's treating physicians document episodes of joint pain and digestive problems (Tr. 166); fatigue and pain, mouth sores, sore spots on the head, positive fibromyalgia

---

[7]In his review of the evidence, the Commissioner states that Dr. Richardson indicated in February of 2006 that she would not encourage plaintiff to seek disability. The Commissioner is referencing a handwritten telephone message in the Columbus Arthritis Center file dated February 3, 2006, which reads "Filed for Disability. She wants your opinion on doing that." (Tr. 338). The response, which is in different handwriting, is "I would not encourage it and it can be difficult [illegible]." (Tr. 338). Assuming the handwriting is Dr. Richardson's, the note does not show it was Dr. Richardson's opinion plaintiff could perform full-time work as the note is cryptic, only part of the response is legible, and the opinion is not an assessment of plaintiff's functional capacity.

points (Tr. 340); tender fibromyalgia points (Tr. 342); continued fatigue (Tr. 343); pain, muscle

spasms, fatigue (Tr. 344); depression (Tr. 206, 211); and depression, fatigue, paresthesias. (Tr.

181). The records also show a positive ANA screen and speckled ANA pattern. (Tr. 349).

The opinions of the treating physicians regarding plaintiff's inability to sustain full-time

work are further supported by the opinions of Dr. Grodner, Dr. Smith, and Dr. Weaver, the

examining consultative physician and psychologists. Drs. Grodner and Smith indicate that

plaintiff is restricted in her ability to work full-time as a result of her physical and/or mental

impairments. Dr. Grodner opined:

> Because of her pain which requires significant pain medication and her history of
> intermittent muscle spasms, it is my opinion that *she would have major restriction
> with activity over a period of time.* I do believe that she could perform *short
> intervals of a variety of activities, but these would depend on how sustained these
> activities were and also how repetitive they were as well as the time frame she
> was performing these activities.*

(Tr. 435-436) (emphasis added). Dr. Smith opined that plaintiff may have "problems with pace

and persistence over prolonged periods of time, including an eight-hour day or five-day

workweek." (Tr. 452). Dr. Weaver opined that plaintiff had moderate to marked limitations for

sustained day-to-day work activity in terms of her ability to handle stress and pressure, as well as

in her ability to relate to others because of mood and fatigue problems. (Tr. 231).

While the ALJ said he gave "some weight" to the opinions of these consultative

examiners, in reality he disregarded the findings cited above which support plaintiff's limitations

for sustained work activity. Instead, the ALJ selectively relied on only those findings of the

examining medical sources which support an RFC for a limited range of sedentary work.

For example, the ALJ noted Dr. Grodner's assessment that plaintiff "could perform

sedentary activity or even light intermittent activity that involved weight bearing and ambulation

24

for relatively short periods of time" (Tr. 26), yet ignored Dr. Grodner's opinion that plaintiff

may only be able to perform short intervals of a variety of activities and "would have major

restriction with activity over a period of time." (Tr. 435-436). The ALJ gave no valid reason for

crediting only part of Dr. Grodner's opinion while disregarding other material parts of his

opinion.

Likewise, the ALJ minimized Dr. Smith's limitations on sustained work activity by

selectively citing to Dr. Smith's report. The ALJ stated that Dr. Smith opined that plaintiff

would "potentially have problems with persistence and pace over prolonged periods of time" (Tr.

26), but omitted the remaining phrase of Dr. Smith's finding: plaintiff would "potentially have

problems with persistence and pace over prolonged periods of time, *including an eight-hour day

or five-day workweek*." (Tr. 452) (emphasis added). The ALJ failed to discuss how Dr. Smith's

finding would impact plaintiff's ability to perform work on a sustained basis and whether Dr.

Smith's finding was consistent with the other medical opinions in the record.

Similarly, the ALJ stated that he gave "some weight" to Dr. Weaver's findings. (Tr. 21).

Yet, the ALJ never addressed how plaintiff's moderate to marked limitations to withstand stress

and pressure for day-to-day work affected plaintiff's ability to perform sustained work activity in

a work setting on a regular and continuing basis. (Tr. 231).

Although the treating physicians' opinions were well-supported by the medical evidence

in the record and were consistent with the opinions of the consultative examiners, the ALJ

disregarded the limitations on plaintiff's ability to perform work activity on a sustained basis

found by plaintiff's treating physicians. (Tr. 26-27). The ALJ gave "less weight" to the opinions

of plaintiff's treating rheumatologists, ignored the opinion of Dr. Grulkowski, plaintiff's treating

25

family physician, and discounted the opinions of the consultative examiners in favor of the

opinion of a non-examining internist who testified at the hearing because Dr. Jilhewar "had the

opportunity to review the entire record and to hear the claimant's testimony and his opinion is

consistent with the totality of the medical evidence." (Tr. 26).

The ALJ's decision which relies on Dr. Jilhewar's testimony to find plaintiff capable of

sustained work activity is unsupported by substantial evidence. Dr. Jilhewar's testimony is

internally inconsistent and at odds with the substantial evidence of record. While Dr. Jilhewar

testified that plaintiff would be able to do sedentary work if her fatigue was accepted as a

symptom, he also testified that he concurred with plaintiff's need for FMLA leave in order to

work. (Tr. 591-593). Dr. Jilhewar acknowledged that his opinion on plaintiff's ability to do

sedentary work was inconsistent with Dr. Grodner's February 2008 consultative exam and RFC

assessment and with the treating rheumatologist's opinion that plaintiff could perform only part-

time work (Tr. 592-593), yet the ALJ made no attempt to resolve this discrepancy. Moreover,

Dr. Jilhewar testified that he disagreed with the consultative and treating physician opinions

based on a lack of "abnormal objective findings" and "objective clinical findings." (Tr. 591,

593). The ALJ's reliance of Dr. Jilhewar's opinion in this regard demonstrates the ALJ's

fundamental misunderstanding of fibromyalgia, which cannot be confirmed by objective

findings. As the Sixth Circuit has noted, an opinion on fibromyalgia which focuses upon the

absence of objective evidence is "not particularly relevant" given "the unique evidentiary

difficulties associated with the diagnosis and treatment of fibromyalgia." *See Rogers*, 486 F.3d

at 245. In addition, in adopting the opinion of Dr. Jilhewar, a non-examining internist, over the

opinions of the treating rheumatologists in this case, the ALJ ignored his duty to consider the

medical specialty of the physicians in accordance with the Social Security regulations. *See* 20 C.F.R. § 404.1527(d)(3)-(6); *Wilson*, 378 F.3d at 544. In view of the above, Dr. Jilhewar's testimony is not "substantial evidence" which contradicts the opinions of plaintiff's treating and examining physicians. *See* 20 C.F.R. § 404.1527(d)(2).

In sum, the ALJ's determination that plaintiff had the RFC to perform a limited range of sedentary work on a full-time basis is not supported by substantial evidence. The ALJ acknowledged that plaintiff's treating physicians hold the opinion that she is unable to perform work activity on a sustained basis as a result of her impairments. The record contains several years' worth of treatment notes documenting the treating physicians' regular clinical examinations, tests, referrals, and treatment for plaintiff's impairments as discussed above. The evidence demonstrates that plaintiff's impairments have precluded her from engaging in full-time employment since well before the date last insured. Because these opinions are supported by the medical evidence in the case and are not inconsistent with the other substantial evidence in the record, they are entitled to controlling weight. *See* 20 C.F.R. § 404.1527(d)(2). The ALJ failed to offer a valid explanation for disregarding the findings of the treating and examining medical sources which did not support his RFC assessment and relying instead on the opinion of the non-examining physician, whose opinion was less than clear and is entitled to less weight than the opinions of the treating and examining medical sources. *See Ealy*, 594 F.3d at 514 (citing 20 C.F.R. § 404.1527(d)(1)). Although the ALJ was not bound by the treating and examining medical sources' opinions, the ALJ was obligated to weigh these opinions in accordance with the required pertinent factors and to give "good reasons" for the weight he gave the opinions of the treating sources. *See* 20 C.F.R. § 404.1527(d)(2). The ALJ failed on both counts, and his rejection of the treating and examining medical sources' opinions lacks substantial support in the

27

record. Accordingly, plaintiff's first and second assignments of error should be sustained.

**(3) The ALJ erred in evaluating plaintiff's mental impairments[8]**

The ALJ determined that plaintiff suffers from depression and anxiety, but the only

mental limitation on her RFC is that she is limited to simple and unskilled work. (Tr. 21).

Plaintiff asserts that the ALJ erred by making this finding without explaining how he arrived at

this limitation as required under SSR 96-2p and 96-8p, and by failing to account for her mental

limitations of maintaining attention on a job and dealing with others and with stress on a job.

(*See* Tr. 227-231, 447-452).

The Commissioner counters that the ALJ reasonably determined plaintiff's mental RFC

by describing the evidence from the examining psychologists, Dr. Weaver and Dr. Smith, as well

as the other evidence related to the Listing 12.04 "B" and "C" criteria. (Tr. 21-22). The

Commissioner contends that the ALJ restricted plaintiff to simple, unskilled tasks consistent with

his finding that she had difficulties with concentration, persistence or pace. (Tr. 21-22). The

Commissioner contends this restriction was consistent with the opinions of Dr. Weaver (Tr. 230-

31), Dr. Smith (Tr. 447-55) and the state agency psychologist, Dr. Steven J. Meyer, Ph.D. (a

nonexamining psychologist whose assessment the ALJ did not reference). (Tr. 232-47).

Dr. Weaver diagnosed plaintiff with pain disorder associated with psychological features

and general medical condition, bipolar II, and polysubstance dependence in remission. (Tr. 230).

Dr. Weaver made the following findings:

- Plaintiff's ability to withstand the stress and pressure of day-to-day work seemed moderately to markedly impaired;
- her ability to understand, remember and follow instructions seemed not impaired;
- her ability to maintain attention, pace and persistence seemed moderately impaired due to

---

[8]The Court has reversed the order of plaintiff's third and fourth assignments of error.

fatigue, napping and hopelessness; and

• she reported that her ability to relate to others is moderately to markedly impaired.

(Tr. 231). Dr. Smith made the following findings:

• Plaintiff would be able to relate sufficiently to coworkers and supervisors for simple and repetitive work tasks which do not require complicated or detailed verbal instructions;
• she is mentally capable of understanding, remembering and following instructions for simple and some multi-step repetitive tasks,
• her mental ability to understand and follow instructions may be moderately impaired by her anxiety and depression;
• her mental ability to maintain attention, concentration, persistence and pace to perform routine tasks may be moderately to markedly impaired, and she may have problems with pace and persistence over prolonged periods of time, including an 8-hour day or 5-day workweek;
• she would do best in work settings that do not require her to work in large groups or to drive; and
• her mental ability to withstand the stress and pressures associated with day-to-day work activity may be moderately to markedly impaired.

(Tr. 452). Dr. Smith concluded that overall, plaintiff has "the mental stress tolerance to perform at least simple and repetitive tasks, which do not involve her [sic] to work in large groups or to drive." (Tr. 452).

The ALJ determined that plaintiff is not restricted in the activities of daily living; she has no difficulties in social functioning; and she has moderate difficulties with regard to concentration, persistence or pace. (Tr. 21). The ALJ accorded "less weight" to Dr. Weaver's opinion that plaintiff is "moderately to markedly" impaired in her ability to relate to others because the ALJ found no evidence in the record to support a finding that she has difficulties in this area. (Tr. 21). The ALJ also stated that he accorded Dr. Smith's findings "some weight." (Tr. 26). The ALJ noted that Dr. Smith opined that plaintiff would be able to relate sufficiently to coworkers and supervisors for simple and repetitive work tasks which do not require complicated or detailed verbal instructions; while her mental ability to understand and follow instructions may be moderately impaired by her anxiety and depression, she is mentally capable

29

of understanding, remembering and following instructions for simple and some multi-step repetitive tasks; and she potentially would have problems with pace and persistence over prolonged periods of time. (Tr. 447-455). The ALJ noted that Dr. Smith found plaintiff had the mental stress tolerance to perform "at least simple and repetitive tasks . . ." (Tr. 27).

The Court finds that the ALJ's determination as to plaintiff's mental RFC is not supported by substantial evidence. The ALJ stated that he gave "some weight" to Dr. Weaver's opinion that plaintiff has moderately impaired ability to maintain attention, pace and persistence and moderately impaired ability to withstand stress and pressure. (Tr. 21). These impairments would limit plaintiff's ability to function in a work environment to a significant degree. *Cf. Ealy*, 594 F.3d at 516-517 (examining moderate limitations on concentration, persistence and pace in the context of hypotheticals posed to VEs). Yet, the ALJ never discussed how these impairments factored into the RFC assessment. The ALJ gave no indication in his decision that he actually weighed this evidence in accordance with the regulations. To enable meaningful judicial review, the ALJ must articulate valid reasons for his rejection of the mental health opinions which support a finding of significant restrictions on plaintiff's functioning. Because the ALJ failed to do so in this case, the assignment of error related to plaintiff's mental impairments should be sustained.

**4. The ALJ violated 20 C.F.R. § 404.1529 and SSR 96-7p in evaluating plaintiff's credibility.**

The ALJ found that plaintiff is not credible to the extent she claims she is so limited she cannot engage in substantial gainful activity consistent with the RFC he determined. The ALJ found that the RFC appropriately accounts for plaintiff's pain, the periodic exacerbation of her fibromyalgia symptoms, the side effects of her medicine, and the symptoms she experiences due

to depression. In making the credibility determination, the ALJ found plaintiff's medically determinable impairments could be expected to produce the alleged symptoms. However, he found that her statements concerning the intensity, persistence and limiting effects of these symptoms to be not credible to the extent they are inconsistent with her RFC for the following reasons: (1) the objective medical evidence does not support plaintiff's subjective complaints to the extent she claims that her symptoms preclude her from working; (2) she has only periodic exacerbation of her symptoms as demonstrated by the medical evidence; and (3) while plaintiff reported that she receives assistance from her husband, she is able to carry out a wide range of activities of daily living, she can care for her personal hygiene, she can care for and home school her children, she can perform household chores such as cooking and laundry, and she can do grocery shopping and drive. (Tr. 26).

Plaintiff alleges that the ALJ erred in evaluating her credibility because the ALJ relied on a lack of objective medical findings, which is improper under Sixth Circuit law in a case involving fibromyalgia; plaintiff's daily activities do not demonstrate the ability to work 40 hours per week; and the ALJ failed to assess the specific factors he is required to examine under 20 C.F.R. § 404.1529 and SSR 96-7p, such as the pain medications plaintiff takes and the other methods she uses to relieve her pain. The Commissioner counters that the ALJ properly pointed out that the objective medical evidence does not support plaintiff's pain allegations, the opinions of the doctors allegedly contradicted her claims, and other evidence, such as her considerable activities of daily living, undercut her contention that she is disabled.

"If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). Social Security Regulation 96-7p describes the requirements by which the ALJ must abide in rendering a credibility

31

determination:

> It is not sufficient for the adjudicator to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain *specific reasons* for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

(emphasis added). The ALJ's credibility decision must also include consideration of the following factors: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c); SSR 96-7p. In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk*, 667 F.2d at 538.

In the instant case, the ALJ's credibility assessment is not supported by substantial evidence. First and foremost, in assessing plaintiff's credibility, the ALJ failed to recognize that objective tests are of little relevance in determining the existence or severity of fibromyalgia. (Tr. 24). *See Rogers*, 486 F.3d at 243; *Preston*, 854 F.2d at 820. In addition, the ALJ failed to account for the episodic nature of plaintiff's conditions. *See, e.g., Bowman v. Barnhart*, 310 F.3d

32

1080, 1084 (8th Cir. 2002) (lupus is "a chronic, remitting, relapsing, inflammatory" condition

that causes pain and swelling which can "flare-up, subside, and flare-up again."); *Gillette v.*

*Barnhart*, 291 F. Supp.2d 1071, 1078 (D. N.D. 2003) (recognizing that an individual with lupus

has "good days on which she can be fairly active and bad days when little, if anything, can be

accomplished."). The ALJ points to dates where plaintiff was doing well and was relatively

stable, but he does not mention those occasions when her physicians document that her lupus or

fibromyalgia has flared or where she was otherwise not doing well. For instance, although

plaintiff was seen at the National Road Family Health practice four times, the ALJ mentions only

the last office visit on January 17, 2008, where plaintiff reported she was "doing ok lately" and

her "*usual* pain was stable." (emphasis added) (Tr. 465). The ALJ omits to mention the treating

physician Dr. Grulkowski's opinion that plaintiff was incapacitated two times a month for

approximately two to three days due to her condition. (Tr. 465). Moreover, although the ALJ

states that the record shows that plaintiff's lupus symptoms in particular have been relatively

stable to the point where she has discontinued taking medication on occasion, he fails to note that

she has never been medication-free and that when she has discontinued taking one medication,

she has been prescribed another in its place as noted in the recitation of the medical evidence.

The ALJ also fails to note other ways plaintiff has sought to relieve her pain, including physical

therapy. (Tr. 278-329).

Moreover, the ALJ's reliance on plaintiff's ability to perform the daily activities he listed

to find she was not credible was not reasonable. The ALJ failed to acknowledge that there are

days when plaintiff's severe fatigue and other symptoms preclude her from performing even

these routine activities. The ALJ disregards evidence showing that Dr. Richardson had provided

authorization for plaintiff's husband to take medical leave on account of plaintiff's illnesses (Tr.

33

335, 339, 340, 342) and that plaintiff's husband took FMLA leave on one or more days each
month during 2005 and 2006 to assist plaintiff at home when her conditions had flared. (Tr. 377-
379).

The ALJ also did not recognize that the treating and examining physicians corroborated
plaintiff's pain, fatigue, and mental restrictions and the extent to which these matters limited her
ability to perform work activity on a sustained basis. Rather than reviewing plaintiff's entire
lengthy history of treatment for her lupus and fibromyalgia and accompanying symptoms to
determine whether the medical evidence supported plaintiff's complaints, the ALJ selectively
cited to portions of the record which he believed supported his determination that plaintiff's
complaints were not credible. In the end, the ALJ paints plaintiff to be much more physically
and mentally able than the record shows her to be and points to nothing that actually casts doubt
on her credibility. The ALJ fails to acknowledge that her statements are consistent with the
medical evidence and with the episodic nature of her diseases.

Finally, the ALJ made comments at the hearing which indicate that he entertains
misconceptions about fibromyalgia which may have colored his perception about plaintiff's
credibility. When plaintiff testified as to a figure of speech that her doctor used, relating how her
physician had said she was going to try to duct tape plaintiff together, the ALJ replied:

> Ma'am, there's nothing to duct tape, fibromyalgia has got nothing to do with duct
> tape. It's not like anything's broken there. I mean there might be some - -
> fibromyalgia is basically something that responds to exercise. If you respond to
> exercise you can do more, if you exercise every day [sic] what kind of exercise do
> you do?

(Tr. 596-597). The ALJ's suggestion that fibromyalgia is simply a condition which can be
resolved with exercise strongly suggests he did give credence to plaintiff's testimony based on
his own preconceived notions of the disease and individuals who suffer from it. For all of these

**34**

reasons, the Court finds that the ALJ's credibility determination is not supported by substantial evidence.

## (5) The ALJ erred at step 5 of the sequential evaluation process by relying on the VE's answers to improper hypothetical questions.

Plaintiff claims that the ALJ erred by relying on the answers to improper hypothetical questions posed to the VE. Specifically, plaintiff claims that the ALJ erred by finding that plaintiff had the RFC to do "occasional handling on the right," whereas the hypothetical the ALJ posed included only jobs where there was no forceful gripping bilaterally. (Tr. 603-604). Plaintiff further argues that the ALJ erred because the hypothetical he posed omitted (1) problems with attention, stress and dealing with others on a job; (2) the need to lie down at home for up to 2 hours a day due to fatigue; and (3) the need to miss a number of days from work each month. (Tr. 604, 605).

The Commissioner counters that the alleged error on bilateral forceful gripping is harmless. The Commissioner does not address plaintiff's remaining arguments.

At Step 5 of the sequential evaluation process, the burden shifts to the Commissioner "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Commissioner of Social Sec.,* 336 F.3d 469, 474 (6th Cir. 2003). The Commissioner may meet his burden of identifying other work the claimant can perform through reliance on a VE's testimony in response to a hypothetical question. However, to constitute substantial evidence so as to satisfy the Commissioner's burden, the hypothetical question posed to the VE must accurately reflect the claimant's mental and physical limitations. *Ealy*, 594 F.3d at 516.

Here, the ALJ's hypothetical question to the VE included the limitations that the

35

individual could perform only simple, unskilled sedentary work; the individual could not be required to work at unprotected heights or around dangerous, moving machinery, open flames, or bodies of water; and the individual could not be required to perform any forceful gripping bilaterally or any squatting, kneeling or crawling. (Tr. 603). The ALJ omitted any other mental limitations from the hypothetical beyond simple unskilled work because he did not discern any. (Tr. 602). The ALJ also omitted the need for FMLA leave from the hypothetical because he did not see "any physical, significant physical limitations on exam, clinical exam . . ." (Tr. 605-606). In response to the ALJ's hypothetical, the VE testified that an individual with the limitations the ALJ outlined could perform some assembler, packer and inspection jobs at the sedentary level. (Tr. 603). When the limitation that plaintiff's periodic exacerbation of her fibromyalgia would render her unable to work at least two days a month was added to the other limitations, the VE responded that this was "beyond the tolerated absentee rate of about one day a month." (Tr. 603-604).

The hypothetical propounded by the ALJ failed to include the limitations imposed by the treating and examining physicians. As explained above, the ALJ's RFC assessment, which fails to include the physical and mental impairments which limit plaintiff's ability to engage in full-time work, is not supported by substantial evidence. Therefore, the ALJ's failure to include these limitations in the hypothetical propounded to the VE was also in error. *See White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 789 (6th Cir. 2009) (ALJ erred in relying on answer to hypothetical question because it simply restated RFC which did not accurately portray claimant's physical and

36

mental impairments).[9]  Because the ALJ's hypothetical question failed to accurately portray

plaintiff's physical and mental impairments, the VE's testimony in response thereto does not

constitute substantial evidence that plaintiff could perform the jobs identified by the VE.

Therefore, plaintiff's fifth assignment of error should be sustained.

## REMAND FOR AN AWARD OF BENEFITS

This matter should be remanded for an award of benefits.  "[A]ll essential factual issues

have been resolved and the record adequately establishes . . . plaintiff's entitlement to benefits."

*Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).  As discussed above, based on

the lengthy and detailed medical record and the opinions of plaintiff's treating and examining

medical sources, plaintiff does not have the capacity for even sedentary work on a full-time basis.

Moreover, the record establishes that plaintiff's disability began well before her insured status

lapsed on June 30, 2005, and more than one year before she filed her application for DIB in

March 2004.  Social Security Ruling 83-20 provides that when impairments are progressive in

nature and it is impossible to obtain medical evidence establishing the precise date the

impairment became disabling, the Commissioner must "infer the onset date from the medical and

other evidence that describes the history and symptomatology of the disease process." *In accord*

---

[9]The Court notes that the Sixth Circuit recently held that a hypothetical question limiting the claimant to simple, unskilled, routine jobs did not sufficiently account for moderate deficiencies in concentration, persistence, and pace. *Ealy*, 594 F.3d at 516-17 (citing *Edwards v. Barnhart*, 383 F. Supp.2d 920, 930-31 (E.D. Mich. 2005) (hypothetical limiting claimant to "jobs entailing no more than simple, routine, unskilled work" not adequate to convey moderate limitation in ability to concentrate, persist, and keep pace) ("Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job."); *Whack v. Astrue*, No. 06-4917, 2008 WL 509210, at *8 (E.D. Pa. 2008) (unpublished) (citing cases for the proposition that hypothetical restrictions of "simple" or "low-stress" work do not sufficiently incorporate the claimant's medically established limitations where claimant has moderate deficiencies in concentration, persistence or pace)).  Likewise, this Court has also recognized that where the ALJ's hypothetical failed to include the plaintiff's moderate deficits in memory, attention, and concentration, the VE's testimony does not constitute substantial evidence that the plaintiff can perform her past relevant work. *See Renn v. Commissioner of Social Sec.*, Case No. 1:09-cv-319, 2010 WL 3365944 (S.D. Ohio August 24, 2010) (Beckwith, J.).

*Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989). Here, the medical evidence documents examinations, tests, referrals and treatment for fibromyalgia, lupus and depression for several years predating 2005. Dr. Richardson, one of plaintiff's two treating rheumatologists, first began treating plaintiff in 2001. (Tr. 158). In addition, plaintiff was diagnosed with depression and lupus in October 2002, when she began regular treatment at the Pickerington Family Practice for symptoms which included fatigue, muscle weakness and numbness in the hands. (Tr. 211, 214). The record shows that plaintiff continued to suffer from the same symptoms throughout the course of her treatment with the various treating physicians. Thus, the medical and other evidence establishes a disability onset date beginning as early as 2002.

## IT IS THEREFORE RECOMMENDED THAT:

This case be REVERSED and REMANDED for an award of benefits.

Date: 2/16/2011

Karen L. Litkovitz
United States Magistrate Judge

38

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

NICOLE A. TORRES,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,

Case No. 1:10-cv-109
Weber, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to these proposed findings and recommendations within **FOURTEEN DAYS** after being served with this Report and Recommendation ("R&R"). That period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within **FOURTEEN DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).