**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

NICOLE A. TORRES,

                    **Plaintiff**

      **v.**                             **Case No. 1:10-cv-109-HJW**

COMMISSIONER OF SOCIAL SECURITY,

                    **Defendant**

## ORDER

This matter is before the Court upon the plaintiff's complaint pursuant to 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying her application for disability insurance benefits. Plaintiff has filed a "Statement of Errors" (doc. no. 5), and the Commissioner has responded with a "Statement of the Case" in support of the ALJ's decision (doc. no. 10).  The Magistrate Judge entered a Report and Recommendation, recommending that the Commissioner's final decision be reversed and remanded for an award of benefits (doc. no. 12).  The Commissioner filed specific objections (doc. no. 13).  Plaintiff responded (doc. no. 14) and sought expedited review (doc. no. 15).  Having carefully reviewed the record, the Court finds that the Commissioner's final decision is supported by substantial evidence.  Thus, the Court will <u>sustain</u> the Commissioner's objections, <u>decline</u> the Report and Recommendation, and <u>affirm</u> the Commissioner's final decision for the following reasons:

## I. Background and Procedural History

Plaintiff was born in 1970, completed school through 11th grade, is literate and

speaks English, is married with two children,[1] and has past relevant work experience as a legal secretary, receptionist, office clerk, assistant manager/cashier, and administrative assistant/telephone operator (TR 23-28, 87, 104, 142, 149, 375, 412, 434, 448-449, 457, 491, 547).  Plaintiff testified that she quit her last law office job and started college classes (TR 548).  Although she did not graduate from high school (i.e. she was expelled from high school in spring of her senior year for drinking and truancy, see TR 228), plaintiff thereafter took college classes in accounting, algebra, and medical transcription from 2000 until 2003, and re-enrolled at Columbus State in 2006  (TR 228, 382, 544-45).  Plaintiff home-schools both her children.[2]

Although plaintiff alleges disability as of April 2001, she has provided little or no medical evidence from 2001-2002.  Plaintiff visited her family doctor in 2002 for some complaints (including complaints unrelated to disability, such as temporary nasal congestion) (TR 19, 210, 214). Her physician prescribed  amoxicillin for the congestion and Plaquenil for fatigue.  Plaintiff failed to take the Plaquenil as prescribed, but renewed the prescription in 2003 (TR 19).  She was diagnosed with lupus in 2003 (TR 566).  Based on her complaints, plaintiff was prescribed anti-depressant medication, which was continued in 2004 (TR 181-188, 192-206). Plaintiff did not seek any other treatment for alleged mental difficulties.

In March of 2003, plaintiff visited Dr. Herbert Grodner M.D. for a physical

---

[1] Her second child was born in 1999 (TR 229).

[2] However, plaintiff indicated on her 2004 disability application that she drives her daughter to school (TR 113).

disability evaluation (TR 19, 490).  He observed that plaintiff walked with a normal gait and had 5/5 strength in all muscle groups, with no joint swelling (TR 20).  He noted her past diagnosis of lupus, but after examining her, concluded that she "would have the ability to perform most types of work-related physical activities" and that, despite periodic flare-ups, "I do not believe there is any contraindication for her to perform most types of work-related physical activities" (TR 490-492).  He noted that plaintiff indicated that her symptoms, including fatigue, "have improved since she has been on medication" (TR 19, 490, 492).  Plaintiff testified that fatigue is her main complaint (TR 549).

In November 2003, plaintiff visited Dr. J. Richardson for medication for a "mild flare" of lupus and an upper respiratory infection, which the doctor indicated "was probably part of her fatigue and overall joint pain" (TR 166, 194).  In December 2003, plaintiff saw Dr. Brian Isler for some gastrointestinal complaints, for which he prescribed Nexium, Metamucil, and a high fiber diet (TR 20, 192-193). Plaintiff stopped taking Celebrex because she "felt it may have caused it" (TR 166).  The following year, plaintiff saw Dr. Richardson four times for various complaints and renewal of her lupus medication TR 162, 164, 253, 256, 344).  In April of 2004, Dr. Richardson noted that plaintiff's lupus was "under control" (TR 162-163).

In April of 2004, plaintiff filed an application for disability benefits due to various complaints, including lupus, fibromyalgia, and depression, with an alleged onset date of April 1, 2001 (at age 31) (TR 17).  Plaintiff indicates in her application that she last worked in 2001 (TR 104, 144), although she elsewhere advised that she

worked in 2002 (TR 449, 451) and in 2004 (TR 385, 433).  When she consulted her physician about applying for disability, Dr. Richardson indicated "I would not encourage it" (TR 383).   On March 9, 2005, Dr. Richardson renewed plaintiff's prescription for lupus medication for another year (TR 387 noting that plaintiff had a history of "possible mild lupus").

Consulting psychologist Dr. David Weaver evaluated plaintiff in May 2004 (TR 20, 227-31) and opined that plaintiff's ability to understand, remember, and follow instructions was not impaired, and that testing suggested that plaintiff could understand simple directions and work steadily at repetitive hand-eye work.  Based on plaintiff's self-reports of fatigue, napping, and helplessness, he indicated that plaintiff's ability to maintain attention, pace and persistence may be moderately impaired, and that plaintiff's ability to withstand the stress of daily work may be moderately to markedly impaired (TR 231).

In June of 2004, state agency psychologist Steven Meyer Ph.D. prepared a residual functional capacity ("RFC") assessment indicating that despite "some exaggeration of symptoms," plaintiff was capable of routine work within her restrictions (TR 247).  He pointed out the inconsistency in CE Weaver's report, i.e that CE Weaver's "conclusions are somewhat more limiting than noted in body of CE exam or in [medical evidence] from other sources" (TR 247), and indicated that plaintiff had only mild to moderate limitations (TR 242, 245-46).

After filing for disability, plaintiff saw Dr. Richardson in August and October 2004, and indicated her joint pain was "manageable" (TR 253) and that she had no

joint swelling (TR 344). In 2005, plaintiff saw Dr. Richardson five times for "follow-up for lupus and fibromyalgia"(TR 339-43, 383). Dr. Richardson indicated that plaintiff's lupus was not active in March of 2005 (TR 342) and that plaintiff was "doing well" in July and December 2005 (TR 341, 384). Between February and April of 2005, plaintiff also saw a chiropractor who reported a 60% improvement in symptoms (TR 365-66). Plaintiff's insured status expired on June 30, 2005, when she was 35 years old, i.e. a "younger" individual under 20 C.F.R. § 404.1563 (TR 17, 19, 28, 53).

In 2006, plaintiff continued periodic visits to the chiropractor (TR 407-08) and her physician (TR 380-83). Dr. Richardson's progress notes indicate that plaintiff was doing well In May and July of 2006, had no joint swelling, and no lupus activity (TR 381). Dr. Richardson noted that despite "significantly tender fibromyalgia points" and some back pain (possibly attributable to a past car accident), plaintiff was overall "improved," had been working out at "Curves," and was re-enrolling in college classes (TR 381-382).

The record contains various other records from the post-insured status years, including an evaluation by rheumatologist Dr. Hackshaw who examined plaintiff for the first time in January 2007 and noted symptoms consistent with fibromyalgia (TR 24, 412-14). He concluded that even though plaintiff indicated she was home-schooling her children, she should also "be able to at least hold some part-time position" (TR 413-14). Dr. Hackshaw evaluated plaintiff again nine months later and found tender points "consistent with fibromyalgia," but noted that she had failed to take her Plaquenil and Lyrica (TR 463). Plaintiff explained that she did not

want to be sedated when she home-schooled her children, and Dr. Hacksaw advised her to take most of the medicine at night to avoid daytime sedation (TR 24, 463). In January of 2008, plaintiff's family physician, Dr. M. Grulkowski, indicated plaintiff's lupus was "stable" and emphasized to plaintiff the benefits of exercise and smoking cessation (TR 468, 471).

Plaintiff's disability application was denied initially and upon reconsideration. Upon plaintiff's request, an administrative law judge ("ALJ") held an evidentiary hearing on April 24, 2007 (TR 534-581). Plaintiff was represented by counsel and testified at the hearing. Medical expert Dr. George Snider, M.D. (a specialist in internal medicine) testified that plaintiff's lupus symptoms did not rise to the level of any listing (TR 569). Vocational expert Dr. Bruce Gowick ("VE") also testified. The ALJ denied benefits, but the Appeals Council remanded the case for further consideration. The ALJ fully complied with the remand and further developed the record, including additional expert testimony and consultive examinations by Dr. Herbert Grodner and Margaret Smith, Ph.D (TR 17, 447).

Dr. Grodner examined plaintiff on January 31, 2008 and noted that plaintiff had been off her lupus medication for six months (TR 24, 433-40). He found that she had full muscle strength, and that although she complained of some pain in her right hand, she exhibited no difficulty manipulating it. He concluded that plaintiff could "perform some type of sedentary activity or even light intermittent activity" (TR 435).

On February 20, 2008, Margaret Smith, Ph.D ("CE Smith") conducted a mental status examination of plaintiff (TR 447). Plaintiff indicated she had experienced

bouts of depression "on and off" in the past and had started having anxiety in 2007, but was not in counseling (TR 448).  CE Smith noted that plaintiff's mood and social skills appeared "within the normal range," that plaintiff  had never experienced any type of community problem, and that plaintiff had demonstrated "no problems with attention and concentration" in the  interview (TR 452).  CE Smith opined  that with respect to plaintiff's work-related mental abilities, plaintiff would be able to relate sufficiently to coworkers and supervisors for simple and repetitive tasks, was capable of comprehending and completing simple and routine tasks, and had the mental stress tolerance to perform at least simple and repetitive tasks (TR 452-454).

The ALJ  held a  second hearing on June 18, 2008, at which plaintiff, a second medical expert Dr. A. Jilhewal, and a second VE Susan Entenberg testified (TR 582-618).  Dr. A. Jilhewal  reviewed  the  entire  medical  record  and  heard  plaintiff's testimony (TR 588-594). He discussed plaintiff's medical conditions and advised that he would not limit plaintiff to part-time work because she had not exhibited such "serious fatigue that she cannot do eight hours of work consistently" (TR 593).  He explained that even if the ALJ fully credited plaintiff's subjective complaints, her medical condition would not prevent her from working full-time at the sedentary level (TR 591-592).

VE Entenberg testified that a hypothetical person limited to simple, unskilled sedentary work, with no work around hazards; no forceful gripping bilaterally; and no squatting, kneeling or crawling, could perform the jobs of assembler, packer and inspector (TR 602-03). If the hypothetical was not limited to "unskilled" work, the VE

testified plaintiff could still do her past receptionist and secretarial jobs (TR 603). Relying on the VE's testimony regarding the types and numbers of simple unskilled jobs available to plaintiff within her restrictions, the ALJ determined that plaintiff was able to perform a significant number of sedentary jobs in the national economy. On July 23, 2008, the ALJ issued a decision that plaintiff was not disabled within the meaning of the Social Security Act from April 1, 2001, through her last insured date of June 30, 2005 (TR 16-29).

In summary, the ALJ found in his second decision that plaintiff had severe impairments due to "fibromyalgia, lupus, irritable bowel syndrome, depression, and anxiety" (TR 19, Finding 3), but that these impairments or combination of impairments did not meet any listing. The ALJ found that plaintiff could not perform her past relevant work,[3] but retained the RFC for sedentary work within her restrictions, and that considering plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that plaintiff could perform (TR 16-29). On December 23, 2009, further administrative review was denied, thus making the ALJ's second decision the final decision of the Commissioner.

## II. Standard of Review

Disability cases are analyzed under the five-step sequential analysis of 20 C.F.R. § 416.920. Judicial review of the Commissioner's final decision is limited to determining whether the ALJ's findings are supported by substantial evidence and

---

[3]Plaintiff testified that she had lifted 50 pound boxes frequently in her past work as an assistant store manager.

whether the proper legal standards were applied.  42 U.S.C. § 405(g);  Richardson v. Perales, 402 U.S. 389, 401 (1971);  White v. Comm'r of Soc. Sec., 572 F.3d 272, 281 (6th Cir. 2009).  The ALJ's decision must be affirmed if the Court finds that the decision is supported by substantial evidence in the record as a whole.  Kirk v. Sec. of HHS, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Lindsley v. Comm'r of Soc. Sec., 560 F.3d 601, 604 (6th Cir. 2009) (quoting Richardson, 402 U.S. at 401). Importantly, the ALJ's decision may not be reversed merely because substantial evidence might support a different decision.  Casey v. Sec. of HHS, 987 F.2d 1230, 1233 (6th Cir. 1993). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." Id. A district court may affirm, modify, or reverse the Commissioner's decision, with or without remand. 42 U.S.C. § 405(g).

III.  Issues Presented

Plaintiff generally contends that the ALJ erred in evaluating the "nature" of fibromyalgia, in weighing the medical opinions, in assessing her work-related mental limitations, in determining her credibility, and in making "vocational errors" at the final step (doc. no. 5).[4]  In response, the Commissioner extensively reviewed the

---

[4]Plaintiff essentially seeks review of every aspect of the evidence before the ALJ.  However, review is limited to determining whether substantial evidence supports the ALJ's decision.  See Arnett v. Commissioner, 76 F. Appx. 713 (6th Cir. 2003) (district courts are "not charged with conducting the kind of 'super review' requested.").

evidence to show that the ALJ's decision was supported by substantial evidence at each step (doc. no. 10).

On February 16, 2011, the Magistrate Judge issued a forty-page Report and Recommendation, recommending that the ALJ erred in evaluating the medical evidence and plaintiff's credibility, and that the case should be remanded for an award of benefits.  The Commissioner objected that the Magistrate Judge had relied largely on evidence generated after the expiration of plaintiff's insured date and did not properly evaluate the relevant framework under which the ALJ considered the evidence (doc. no. 13).  The Commissioner further objected that plaintiff's onset date was not supported by the evidence, that mere "diagnosis and medication do not equal disability," that the evidence did not reflect disabling functional limitations of the level of Rogers and Preston, and that plaintiff had failed to meet the high standard required for an award of benefits (Id.).  Plaintiff filed a response on March 7, 2011 (doc. no. 14), and this matter is ripe for review.

IV.  Analysis

A. The ALJ's Finding of Severe Impairment

Contrary to plaintiff's allegation, the ALJ did not err in evaluating the "nature of fibromyalgia" at any step of the sequential process.  Although fibromyalgia can be difficult to diagnose, the process for diagnosing fibromyalgia generally "involves testing for tenderness in focal points and ruling out other conditions." Rogers v. Commissioner, 486 F.3d 234, 244 (6th Cir. 2007); and see, Preston v. Sec'y of Health & Human Servs., 854 F.2d 815, 817–18 (6th Cir.1988).  Plaintiff misunderstands, and

seeks to misapply, the holding of Rogers, where despite diagnosis of fibromyalgia by multiple specialists and a lengthy treatment history, the ALJ improperly found no "severe impairment."  The Rogers decision involved the ALJ's analysis at step two of the sequential analysis, whereas the present ALJ did find plaintiff's fibromyalgia to be a "severe impairment" and continued his analysis through step five (TR 19-29).

The ALJ noted that Drs. Hacksaw and Grodner had evaluated plaintiff in 2007 and 2008 (TR 24), with tenderness noted at 18 trigger points.  Given that plaintiff had complained of pain and fatigue during her periodic visits to several physicians in 2003-2005, given that Dr. Richardson's progress notes for plaintiff in 2004 cite lupus and fibromyalgia (TR 253), and given that the medical record contained trigger-point findings (albeit several years after her insured status expired), the ALJ found plaintiff's fibromyalgia to be a "severe impairment" (TR 19, Finding 3).  This finding is adequately supported by substantial evidence. The parties do not dispute the ALJ's finding that plaintiff did not have an impairment or combination of impairments that met any listing (TR 20 at Finding 4).

## B.  The ALJ's Determination of Residual Functional Capacity

Plaintiff's arguments (regarding the weight given the medical opinions, work-related mental limitations, and plaintiff's credibility) and the Commissioner's objections (that  the 2001-2005 evidence did not rise to the level in Rogers and Preston, and that mere "diagnosis and medication do not equal disability") all relate to the ALJ's RFC determination (TR 22-28, Finding 5).

As the Commissioner correctly explains, a mere diagnosis of fibromyalgia

says nothing about the severity of any resulting functional limitations and does not automatically entitle a claimant to disability benefits. See Vance v. Commissioner, 260 Fed. Appx. 801, 806 (6th Cir. 2008).  The ALJ correctly recognized this (TR 613 explaining that "I've got to evaluate you in terms of limitations").  While some people may have fibromyalgia so severe as to be totally disabled from working, "most do not and the question is whether [the claimant] is one of the minority." Id. (quoting Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996)); see also, Preston, 854 F.2d at 818 (observing that "[m]ost people complaining of fibromyalgia, even those who are properly and accurately diagnosed, are not totally disabled from working").

Disability is not determined merely by diagnosis of impairments, but rather, by resulting functional restrictions. "While the diagnosis of ... fibromyalgia may not lend [itself] to objective clinical findings, the physical limitations imposed by the symptoms of such illness do lend themselves to objective analysis." Boardman v. Prudential Ins. Co., 337 F.3d 9, 16-17 n. 5 (1st Cir. 2003). "One method of objective proof of disability, for instance, is a functional capacity evaluation, a reliable and objective method of gauging the extent one can complete work-related tasks." Huffaker, 271 Fed. Appx. at 500;  see also, Rose v. Hartford Fin. Servs., 268 Fed. Appx. 444, 454 (6th Cir. 2008) (noting the important difference between diagnosis of fibromyalgia and the requirement that there be objective evidence of the effects of the condition on a person's functional abilities).

The ALJ appropriately found that plaintiff's fibromyalgia did not result in disabling functional limitations on or before her last insured date in 2005 (TR 29,

Finding 11). The ALJ observed that the medical records show that although plaintiff periodically suffered pain and fatigue, doctors repeatedly noted that she improved with medication (TR 25, 462-63, 490, 578, 590).  The ALJ further noted that plaintiff was often non-compliant with her physician's instructions, i.e. she failed to take various prescribed medications or attend therapy (TR 19, 229, 463, 540); and see, 20 C.F.R. § 416.930 (setting forth need to follow prescribed regimen).  In fact, plaintiff told Dr. Hacksaw that she hadn't taken her medication for six months (TR 463).

In disputing the ALJ's RFC determination, plaintiff complains that the ALJ gave the "most weight" to the non-examining medical expert, "some weight" to the 2007 opinions of the consulting doctor and psychologist, and "less weight" to treating physicians Drs. Richardson and Hacksaw (doc. no. 5 at  1).  However, plaintiff ignores the ALJ's lengthy discussion of the medical evidence and explanations for the relative weight assigned the various medical opinions (TR 19-27).  Although plaintiff persuaded the Magistrate Judge that the ALJ should have weighed the evidence differently, an ALJ's decision may not be reversed merely because substantial evidence might support a different decision. Casey, 987 F.2d at 1233.  The ALJ's decision, including his RFC determination, was adequately supported by substantial evidence.

The medical opinions of treating physicians are given great weight, unless the ALJ provides "good reasons" for not assigning such weight.   20 C.F.R. § 404.1527(d)(2); Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004).  Of course, the ALJ "is not bound by conclusory statements of doctors." Buxton, 246

F.3d at 773; 20 C.F.R. § 404.1527(e)(1) (reserving the disability determination to the Commissioner). Subsection (e)(3) specifically states that no "special significance" will be given to opinions of disability, even those made by the treating physician. 20 C.F.R. § 404.1527(e)(3).

Here, plaintiff's physicians indicated she <u>could work</u>. The ALJ discussed that Dr. Richardson (the physician with the longest treating history) had indicated her impression that plaintiff was able to work, assuming some FMLA coverage for occasional days off, and that Dr. Hacksaw had indicated that plaintiff could work "at least part-time" (TR 27, 413).[5] Plaintiff misconstrues Dr. Hacksaw's reference and urges that he was restricting her to only part-time work. The record belies such contention. Plaintiff told Dr. Hacksaw that she was home-schooling, and thus he indicated she could "at least" work part-time too. The medical expert agreed that plaintiff could work full-time at the sedentary level. Although plaintiff's physicians noted her subjective complaints, ordered lab tests, recommended exercise, and prescribed medication, the ALJ appropriately gave their brief comments about plaintiff's ability to work "less weight" because they did not actually assess plaintiff's ability to perform specific work-related functions or restrict her activities (TR 27). The ALJ appropriately weighed these comments.

---

[5]The Commissioner correctly points out that the ALJ assumed that Dr. Hacksaw was a treating physician, even though this doctor's evaluation was from an initial visit in 2007, several years after the expiration of plaintiff's insured status (doc. no. 10 at 2). To qualify as a treating source, a physician must have "examined the claimant ... [and have] an 'ongoing treatment relationship' with [the claimant] consistent with accepted medical practice." <u>Smith v. Comm'r of Soc. Sec</u>., 482 F.3d 873, 875 (6th Cir.2007) (quoting 20 C.F.R. § 404.1502).

Although symptoms of fibromyalgia are largely subjective, plaintiff turns the law on its head by arguing that the ALJ's RFC determination could not be based in part on the medical expert's testimony or any reference to "objective evidence" in determining her limitations (doc. no. 5 at 6).  An ALJ may engage a medical expert who "participates in determining whether your medically determinable impairment(s) could reasonably be expected to produce your alleged symptoms."  20 C.F.R. § 404.1529(b).  The Social Security guidelines explain that "the primary reason an ALJ may obtain [medical expert] opinion is to gain information which will help him or her evaluate the medical evidence in a case" (TR 211, Hallex I-2-5-32 "Medical Experts").

After Dr. A. Jilhewal reviewed the entire medical record and observed plaintiff at the hearing, he discussed the medical evidence regarding plaintiff's lupus and other ailments in detail (TR 588-594).  He noted that plaintiff's treating physician had indicated that plaintiff continued "to respond well to physical therapy" (TR 589). Dr. Jilhewal testified that he would not limit plaintiff to part-time work because she had not exhibited such "serious fatigue that she cannot do eight hours of work consistently" (TR 593).  He agreed that plaintiff could do sedentary work (TR 592-93).  He noted that there were "no abnormal hand findings" in evidence (Id.).  The ALJ indicated that Dr. Jilwehar had reviewed the entire record and that his testimony was consistent with the "totality of the medical evidence of record" (TR 26).  The ALJ could appropriately assign this expert testimony "substantial weight" (TR 26).

The ALJ also indicated that he had considered the opinions of the consulting examiners and state agency medical consultants (TR 26) and specifically discussed

the opinions of Drs. Grodner and Smith. The ALJ sufficiently accounted for Dr. Grodner's note that plaintiff should have "an ergonomically optimal position at work" by finding an RFC of sedentary work with various postural restrictions, which were included in the hypothetical questions to the VE (TR 602-03 "no work around hazards; no forceful gripping bilaterally; and no squatting, kneeling or crawling").

Plaintiff briefly complains that the ALJ did not give sufficient weight to one of Dr. Smith's findings, but ignores her conclusion in the next sentence that "overall, it is concluded that [plaintiff] has the mental stress tolerance to perform at least simple and repetitive tasks."[6]  Even assuming that this 2008 evaluation was at all probative of plaintiff's condition prior to June 30, 2005 (which the Commissioner denies), the ALJ did restrict plaintiff to "simple unskilled" sedentary work (TR 22 at Finding 6; TR 603) to account for any mental limitations. The ALJ noted the plaintiff's various activities and home-schooling of her children, but nonetheless gave plaintiff the benefit of the doubt and restricted her to "simple unskilled" work. The restriction to "simple unskilled" work is generous and is consistent with the psychological report (TR 452) and other evidence of record (TR 230-231, MMPI-2 test indicated plaintiff could follow "simple directions" and had ability to "work steadily").  In short, contrary to plaintiff's allegation, the ALJ's RFC assessment was not based on an improper weighing of medical opinions or work-related mental limitations.

## C.  The ALJ's Credibility Determination

---

[6]Plaintiff erroneously indicates this findings is from the 2004 evaluation, but cites the 2008 evaluation (doc. no. 5 at 4; citing TR 452).

Plaintiff also disputes the ALJ's RFC determination regarding plaintiff's credibility and contends that the ALJ should have found plaintiff's subjective complaints "fully credible." On review for substantial evidence, courts must accord great deference to the ALJ's credibility determinations. Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). The ALJ had the opportunity to observe plaintiff's demeanor while testifying. Id. citing Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 528 (6th Cir. 1997). Courts may not decide questions of credibility when reviewing for substantial evidence. Myers v. Richardson, 471 F.2d 1265, 1267 (6th Cir. 1972). Discounting a claimant's credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, the claimant's testimony, and other evidence. Warner, 375 F.3d at 392; Walters, 127 F.3d at 531.

In evaluating complaints of pain, an ALJ may properly consider the credibility of the claimant. Allen v. Comm'r of Soc. Sec., 561 F.3d 646, 652 (6th Cir. 2009)("credibility determinations with respect to subjective complaints of pain rest with the ALJ"); Walters, 127 F.3d at 531; Kirk, 667 F.2d at 536. "[S]ubjective complaints of a claimant can support a claim for disability, if there is also evidence of an underlying medical condition in the record." Cruse v. Commissioner of Soc. Sec., 502 F.3d 532, 542 (6th Cir. 2007). In evaluating claims of pain that cannot be shown through objective medical evidence, the ALJ must consider a plaintiff's statements about the "intensity, persistence, and limiting effects of [her] symptoms." 20 C.F.R. § 404.1529. The ALJ must consider the entire record, including the claimant's statements about symptoms, evidence of physicians and other

persons about the symptoms and how they affect the claimant, and any other relevant evidence in the record. Soc. Sec. Rul. 96-7p, 1996 WL 374186 at *1-2.

After considering the evidence as a whole, the ALJ found that the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that her allegations of resulting limitations were not entirely credible to the extent inconsistent with the RFC (TR 23, 26). The ALJ extensively discussed plaintiff' subjective complaints and functional abilities, and concluded that "[a]lthough the undersigned accepts her allegations that her symptoms limit her functional capacity to a certain degree, the claimant is not credible to the extent that she claims her capacity is so limited that she is unable to engage in substantial gainful activity consistent with the [RFC]" (TR 26).  In other words, he acknowledged her limitations but found she could still perform sedentary work within her restrictions.

In considering the record as a whole, the ALJ considered the plaintiff's daily activities.  In contrast to the claimant in <u>Rogers</u> who was able to perform only "minimal daily functions," the ALJ accurately observed that plaintiff engaged in a wide variety of activities (TR 20).  An ALJ may consider household and social activities in evaluating complaints of disabling pain. <u>Blacha v. Secretary of Health and Human Services</u>, 927 F.2d 228, 231 (6th Cir. 1990) (per curiam).  Plaintiff's self-reported activities include studying for college courses, grocery shopping for up to 1.5 hours several times per month, preparing simple meals, washing dishes, driving her car locally, taking care of her family, bathing and dressing her children, feeding

the dog, reading several hours a week, doing crafts several times a month, watching television several hours daily, attending church,[7] talking daily on the telephone, checking her emails, attending a monthly couples group, doing laundry and cleaning on "good days," some housework, walking and stretching exercises, grading her children's home work, working out in aerobics and "circuit training" at "Curves" (TR 381, 597, 615), and taking care of her own personal needs (see TR 20, 113-119, 228, 381-82, 449, 547, 589, 594, 597, 599, 601, 606-607).  Plaintiff indicates she takes pain medication, gets tired, and takes naps in the afternoon, and that her husband assists her with household chores on days when she has "flare-ups" and is not feeling well.

Although plaintiff says stiffness keeps her from sitting for long periods, she indicated she watches television for several hours a day (TR 117).  Although she claims muscle weakness, her physical exams showed normal muscle strength (scored at 5/5) and no muscle atrophy.  Dr. Hackshaw examined plaintiff on January 10, 2007, and indicated that  plaintiff was only limited "a little" in terms of walking a mile, lifting groceries, getting in and out of her car, and other such everyday activities (TR 589, citing Ex. 15F at 4, TR 413).  See Walters, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence").

Plaintiff contends that the ALJ erred by not noting that "caring for children is

---

[7]**Plaintiff indicates she attends church twice weekly (TR 116, 228), but elsewhere indicates she attends once a month (TR 601).**

not the same as working 40 hours a week at a competitive job." This argument misses the mark. In considering the record as a whole, the ALJ may properly consider all of plaintiff activities, including child care and home-schooling. It is the ALJ's job, as fact-finder, "to pass upon the credibility of the witnesses and weigh and evaluate their testimony." Myers, 471 F.2d at 1267; Walters, 127 F.3d at 528. The inconsistencies between plaintiff's testimony and the record provide substantial evidence to support the ALJ's decision to discount her testimony in part. 42 U.S.C. §§ 423(d)(5)(A), 1382c(a)(3)(H)(I); 20 C.F.R. § 416.929; Jones v. Sec. of Health and Human Servs., 945 F.2d 1365, 1369-70 (6th Cir.1991); Oliver v. Commissioner of Social Sec., Slip Copy, 2011 WL 924688 (6th Cir. (Mich.)).

For example, the record contains numerous inconsistencies in plaintiff's statements. Although plaintiff repeatedly told her treating doctors she had not abused alcohol or drugs (TR 192, 457, 491), CE Weaver reported that plaintiff acknowledged using illegal drugs and alcohol, but claimed to have stopped in 1996. Plaintiff elsewhere claims to have stopped in 1993 (TR 540). Although plaintiff concealed this from her doctors, she admitted to the psychological examiner that she was drinking alcohol and using illegal drugs in high school, was suspended for fighting, expelled from high school for truancy due to drinking, and was arrested for "bad checks" at age 18 (TR 228-229). She also admitted to hiding her tobacco use and trying "all drugs" (Id.). Plaintiff told Dr. Grodner that she graduated from high school (TR 491), but acknowledged elsewhere that she did not graduate and gave varying reasons. Plaintiff claimed she stopped working when her employer retired

(TR 228), but later testified that her employer did not retire and that she just quit (TR 544, 548).  Plaintiff told her doctor that her birth mother had died of drug abuse in 2002 (TR 211); she told other doctors that her birth mother had died in 2003 "with emphysema" (TR 227, 490); and in 2008, she told CE Smith that she had "recently" met her birth mother (TR 448).  In light of the evidence as a whole, including such inconsistencies, the ALJ's determination that plaintiff was less than fully credible regarding her limitations is supported by substantial evidence.

## D.  Relevant Time-Frame for Analysis

The Commissioner points out that in order for a claimant to be eligible for disability benefits under Title II of the Social Security Act, plaintiff must have had disability insured status in the quarter in which she allegedly became disabled.  20 C.F.R. §404.131; 42 U.S.C. §423(a) and (c); 20 C.F.R. §404.101.  This means that the plaintiff was required to prove that she was disabled on or before the date her disability insured status expired on June 30, 2005.  The Commissioner points out that, despite an alleged onset date in April 2001, plaintiff produced little or no evidence for 2001-2003, and that the Magistrate Judge's recommendation that benefits be granted "going back sometime in 2002" is unacceptably vague.  Even the plaintiff concedes that she would not be entitled to benefits any earlier than 2003 (doc. nos. 5 at 3; 14 at 3).

The Commissioner asserts that the evidence from 2001 through 2005 did not rise to the standard of Preston and Rogers, and cites numerous cases where fibromyalgia did not result in disabling limitations. See, e.g., Vance, 2008 WL 162942

at *5 ("unlike in Rogers where claimant's fibromyalgia symptoms progressively worsened, [the present claimant's] symptoms have either improved or remained stable"), Brazier v. Sec'y of Health & Human Servs., 1995 WL 418079, *9 (6th Cir. 1995)(finding that plaintiff's fibromyalgia was not disabling); Potts v. Sec'y of Health & Human Servs., 1993 WL 303363, *6 (6th Cir. 1993).  The Commissioner objects that the plaintiff did not establish disability during the relevant time period (i.e. from April 2001 through June 2005) (doc. no. 13 at 2).  Plaintiff had the burden (through the fourth sequential step) to prove that she was disabled on or before June 30, 2005. See Moon v. Sullivan, 923 F.2d 1175, 1182 (6th Cir. 1990).

Plaintiff argues that post-insured status evidence, including CE evaluations from 2008, should "relate back" to her condition in 2001 because "evidence of treatment received after the date last insured is relevant to the impairments prior to the date last insured" (doc. no. 14 at 2). Plaintiff overstates the relevant law. Documents generated after expiration of insured status are generally only "minimally probative," and courts consider them only to the extent that they actually illuminate a claimant's health before expiration of insured status. Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988); Siterlet v. Secretary of Health & Human Servs., 823 F.2d 918, 920 (6th Cir. 1987); and see, e.g., Strong v. Social Security Admin., 88 Fed. Appx. 841, 845 (6th Cir. 2004).  The Commissioner aptly points out that most of the evidence relied upon by the Magistrate Judge post-dated the expiration of plaintiff's  insured status by several years (doc. no. 13 at 2).  In any event, even considering the post-insured date evidence, the ALJ appropriately found that the plaintiff failed to show that she

was disabled on or before her "insured status" expired in 2005 (TR 29 at Finding 11).

## E.  Whether  the ALJ Made "Vocational Errors" at Step 5

Finally, plaintiff complains of "vocational errors" at step five. At the second hearing, the ALJ posed hypothetical questions to the VE incorporating various restrictions  (TR 602-03).  VE Entenberg testified that a hypothetical person limited to simple, unskilled sedentary work, with no work around hazards, no forceful gripping bilaterally, and no squatting, kneeling or crawling, could work as a assembler, packer, and inspector (TR 602-03).  The ALJ was entitled to rely on this testimony.

Plaintiff complains that the hypothetical indicated "no forceful gripping bilaterally" rather than a limitation of only the right hand.  However, the hypothetical question was not "materially different," as it was actually more inclusive than a restriction of a single hand.  In other words, the hypothetical question assumed restriction of both hands, whereas plaintiff argues only for restriction of the right hand.  Even though the medical expert (Dr. Jilwehar) pointed out that the record did not reflect any medical evidence supporting a hand restriction, the ALJ gave the plaintiff the benefit of the doubt (i.e. credited her subjective complaint to Dr. Grodner of right hand pain, see TR 435).  Plaintiff ignores the fact that Dr. Grodner found that plaintiff "can  grasp and manipulate with each hand without difficulty. . . she has no difficulty picking up smaller objects or buttoning" (TR 435). The ALJ noted this observation in his decision (TR 20).  The ALJ included a restriction for <u>both</u> hands in the hypothetical question to the VE and restricted plaintiff to sedentary work,

which limits lifting to ten pounds or less.[8]  Plaintiff has not shown that the hypothetical question was "materially different" from the ALJ's RFC determination. Felisky v. Bowen, 35 F.3d 1027, 1036 (6th Cir.1994) (the hypothetical question must accurately describe the  claimant); Buxton, 246 F.3d at 772 (same).  At the hearing, plaintiff''s counsel did not object or request a restriction limited to the right hand (TR 603).  Even if the ALJ's hypothetical question had been posed in the manner now suggested by plaintiff, this would not have affected the outcome.

To the extent plaintiff briefly complains that the hypothetical question did not account for the days of work that plaintiff would allegedly miss due to fatigue (doc. no. 5 at 9), the ALJ did not find plaintiff to be fully credible and was not required to pose hypothetical questions to the VE which incorporated the degree of limitation claimed by plaintiff.  It is well settled that the ALJ's hypothetical questions need only incorporate the limitations found credible by the ALJ.  Casey, 987 F.2d at 1235; Jones, 336 F.3d at 476.  The ALJ's description of plaintiff's RFC accurately reflected her abilities and is supported by substantial evidence.

## V.  Conclusion

The Court finds that the Commissioner's final decision is supported by substantial evidence in the record as a whole and must be affirmed.  Kirk, 667 F.2d

---

[8]**Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a) and 416.967(a); Social Security Ruling 96-9p.**

at 536 (reiterating that an ALJ's decision must be affirmed if the Court finds that the decision is supported by substantial evidence in the record as a whole).

Accordingly, the Commissioner's objections are sustained, and the final decision of the Commissioner is AFFIRMED; the claimant's motion to expedite (doc. no. 15) is DENIED as moot; this case is TERMINATED on the docket of this Court.

IT IS SO ORDERED.

          **s/Herman J. Weber**
          **Herman J. Weber, Senior Judge**
          **United States District Court**